# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MARK SEIFRIED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.: 6:12-cv-00032-JHP** |
| | ) | |
| PORTFOLIO RECOVERY | ) | |
| ASSOCIATES, LLC, a wholly-owned | ) | **(Unlawful Debt Collection Practices)** |
| subsidiary of PORTFOLIO RECOVERY | ) | |
| ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

By: /s/ Tara L. Patterson
Tara L. Patterson, Esquire
KIMMEL & SILVERMAN, P.C.
30 East Butler Pike
Ambler, PA 19002
Email: tpatterson@creditlaw.com
*Attorney for Plaintiff*

By: /s/ Joseph L. Gentilcore
Joseph L. Gentilcore, Esquire
KIMMEL & SILVERMAN, P.C.
30 East Butler Pike
Ambler, PA 19002
Email: jgentilcore@creditlaw.com
*Attorney for Plaintiff*
*Admitted Pro Hac Vice*

Dated: November 1, 2013

<u>Table of Contents</u>

RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED
MATERIAL FACTS ................................................................................................ - 1 -

ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT ... - 10 -

ARGUMENT.......................................................................................................... - 13 -

   A.   Background on the Fair Debt Collection Practices Act......................- 13 -

   B.   Defendant has only moved for Summary Judgment on a portion of
Plaintiff's claims .................................................................................................- 15 -

   C.   There is sufficient evidence on the record to establish that Defendant
intended to annoy or harass Plaintiff ...........................................................- 17 -

   D.   Defendant communicated with Plaintiff after it had knowledge that
Plaintiff was represented by an attorney.......................................................- 19 -

   E.   Defendant has failed to meet its burden in established that it
maintained procedures reasonably adapted to avoid violating the FDCPA..-
20 -

CONCLUSION ..................................................................................................... - 25 -

## Table of Authorities

### CASES

Akalwadi v. Risk Mgmt. Alternatives, Inc., 336 F.Supp. 2d 492, 505 (D. Md. 2004) - 18 -

Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 22 (1st Cir. 2002)------------------------ 14 -

Bartlett v. Heibl, 128 F.3d 497, 499 (7th Cir. 1997) --------------------------------------- 15 -

Ellis v. GMAC, 160 F.3d 703 (11th Cir. 1998)---------------------------------------------- 15 -

Ferini v. Denver Publ'g Co., 153 F.3d 727 (10th Cir. 1998) ------------------------------- 16 -

Gilroy v. Ameriquest Mortg. Co., 632 F.Supp. 2d 132, 136-37 (D. N.H. 2009) -------- 18 -

Isham v. Gurstel, Staloch & Chargo, P.A., 738 F. Supp. 2d 986, 993 (D. Ariz. 2010)- 20 -

Johnson v. Riddle, 443 F.3d 723, 728 (10th Cir. 2006) ------------------------------------ 22 -

Kerwin v. Remittance Assistance Corp., 559 F.Supp. 2d 1117, 1124 (D. Nev. 2008) - 18 -

Malhotra v. Cotter & Co., 885 F.2d 1305, 1310 (7th Cir. 1989) --------------------------- 16 -

Martinez v. Johnson, 2:11CV157-DN, 2013 WL 1031363 (D. Utah Mar. 14, 2013) -- 22 -

McCollough v. Johnson, Rodenburg & Lauinger, LLC, 637 F.3d 939, 948 (9th Cir. 2011)
-------------------------------------------------------------------------------------------- 22 -

O'Loughlin v. The Pritchard Corp., 972 F. Supp. 1352, 1367 (D. Kan. 1997) --------- 15 -

Prewitt v. Wolpoff & Abramson, LLP, 2007 WL 841778 (W.D. N.Y. Mar. 19, 2007)-- 19 -

Russell v. Equifax ARS, 74 F.3d 30, 33 (2nd Cir. 1996)----------------------------------- 15 -

Wilhelm v. Credico, Inc., 519 F.3d 416, 421 (8th Cir. 2008)------------------------------ 22 -

### STATUTES

15 U.S.C. § 1692d ----------------------------------------------------------------------------- 17 -

15 U.S.C. §1692(a) ---------------------------------------------------------------------------- 14 -

15 U.S.C. §1692(e) ---------------------------------------------------------------------------- 14 -

15 U.S.C. §1692c(a)(2)--------------------------------------------- 16 -, - 17 -, - 20 -, - 21 -

15 U.S.C. §1692c(c) ----------------------------------------------------- 4 -, - 16 -, - 17 -

15 U.S.C. §1692d(5)--------------------------------------------- 16 -, - 17 -, - 18 -, - 20 -

Plaintiff, Mark Seifried (hereinafter "Mr. Seifried" or "Plaintiff") and Defendant, Portfolio Recovery Associates LLC (hereinafter "PRA" or "Defendant"), are not strangers.  For years, PRA has been repeatedly calling Mr. Seifried in its attempts to collect a debt.  In fact, during its first call to Mr. Seifried, the parties spoke and Mr. Seifried informed PRA that he could not pay the debt and hung up the phone.  Thereafter, the parties have spoken close to two dozen times over the next four (4) years, and each time, Mr. Seifried told PRA that he was unable to pay or to "quit calling" and hung up the phone.  Even PRA's own internal records indicate that Mr. Seifried did not want to be called.  Despite knowing that its calls were unwanted, PRA continued call Mr. Seifried.  In a final attempt to stop PRA's harassment, Mr. Seifried retained counsel.  Plaintiff's counsel sent PRA a letter demanding that the calls stop and advising PRA that Mr. Seifried was now represented by counsel—but even receipt of this letter did not stop PRA from calling Mr. Seifried.

## RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.      Admitted.  By way of further answer, Plaintiff is a disabled veteran and has been receiving social security disability since 2004.  That is his only source of income. See Doc. No. 81-1, pg.5, ln. 25; See Exhibit 1, pg. 6, ln. 1-8.

2.      Admitted.

3.      Admitted.

4.      Denied.  By way of further answer, Defendant's records indicate that 51 phone calls to Plaintiff connected.  At times, Defendant called Plaintiff as often as four

(4) times in a single day.  Further, records subpoenaed from Plaintiff's telephone service provider indicate that Defendant called Plaintiff 57 times during the relevant period.  <u>See</u> Doc. No. 81-2; Exhibit 2; Exhibit 3.

     5.     Admitted.

     6.     Admitted.

     7.     Denied.  Plaintiff has ample evidence that Defendant called him with the intent to harass.  For example, Defendant's own records indicate that it continued to call after Plaintiff hung up on Defendant and that it called Plaintiff as often as four (4) times in a single day.  <u>See</u> Exhibit 2; Exhibit 3.

     8.     Admitted, in that Plaintiff was receiving other collection calls during the time Defendant was contacting him.

     9.     Denied.  By way of further answer, Plaintiff's telephone records, along with Defendant's internal records indicate the quantity and timing of Defendant's telephone calls to Plaintiff.  <u>See</u> Doc. No. 81-2; Exhibit 2; Exhibit 3.

     10.     Admitted in part and Denied in part.  It is admitted that Plaintiff filed a lawsuit against another collection company, which was eventually settled.  Denied, in that the lawsuit speaks for itself.

     11.     Admitted, in that there were other collection companies calling Plaintiff during the same period of time during which Defendant was contacting him.

     12.     Denied.  By way of further answer, Plaintiff's telephone records, along with Defendant's internal records indicate the quantity and timing of Defendant's telephone calls to Plaintiff.  <u>See</u> Doc. No. 81-2; Exhibit 2; Exhibit 3.

13.    Denied.  By way of further answer, Plaintiff's lawsuits against the other debt collectors were not "similar" in that they were based on distinct conduct engaged in by these other debt collectors.   Conduct which was separate and independent of Defendant's violative conduct.

14.    Denied, in that the Complaint speaks for itself, as well as Plaintiff's responses to Interrogatories and his deposition testimony.

15.    Admitted.

16.    Admitted in part and Denied in part.  It is admitted that Plaintiff states that "Defendant contacted Plaintiff's parents deceptively claiming that they were attempting to contact Plaintiff."   It is denied that Plaintiff failed to identify any other allegedly deceptive conduct in his responses to Interrogatories.   By way of further answer, Defendant never asked Plaintiff to identify what conduct he believed Defendant engaged in that was deceptive.

17.    Denied.  By way of further answer, the factual basis for Plaintiff's legal claim that Defendant was deceptive was set forth in his deposition.  To the extent, that Plaintiff uses the terminology "inappropriate" instead of "deceptive" such lay uses of those terms is inconsequential, as "deceptive" has a unique legal meaning under the FDCPA.  See Doc. No. 81-1 at 13-14.

18.    Denied.  By way of further answer, Plaintiff did testify that Defendant's conduct in contacting his parents was to embarrass him.  See Doc. No. 81-1 at 14-15.

19.     Denied.   By way of further answer, Plaintiff testified that it was inappropriate and embarrassing for Defendant to contact his parents.  See Doc. No. 81-1 at 13-15.

20.     Denied.  By way of further answer, there has been no testimony or evidence regarding how Defendant is structured or any evidence regarding Defendant's "mailroom."  The letter at issue in this case was addressed to Defendant, and the evidence proffered by Defendant states that on December 27, 2011 at 10:37 a.m. EST, Defendant received that letter.  See Doc. No. 81-5; 81-6.

21.     Admitted in part and Denied in part.   It is admitted that Defendant contacted Plaintiff at 7:24 p.m. EST; however, it is denied that it learned for the first time that Plaintiff was represented by counsel at that time.   Instead, the uncontroverted evidence shows that Defendant learned that Plaintiff was represented by counsel at the time that it received Plaintiff Counsel's letter, nearly ten (10) hours prior to the 7:24 p.m. EST telephone call.  See Doc. No. 81-5; 81-6; 15 U.S.C. §1692c(c) ("if such notice from the consumer is made by mail, notification shall be complete upon receipt").

22.     Denied.  By way of further answer, the uncontroverted evidence shows that Defendant learned that Plaintiff was represented by counsel at 10:37 a.m., nearly ten (10) hours prior to its 7:24 p.m. telephone call to Plaintiff.  See Doc. No. 81-5; 81-6; 15 U.S.C. §1692c(c) ("if such notice from the consumer is made by mail, notification shall be complete upon receipt").

23.     Denied.  By way of further answer, it is unknown how many pieces of regular and certified mail Defendant received a day in December 2011.  In his deposition,

Timothy Rees revealed that these figures are based upon "correspondence [he] viewed from the mailroom supervisor," written "in 2013," about "current mail volume." <u>See</u> Exhibit 4, pg. 14, ln. 8-25; pg. 15, ln. 1-6.

24.     Admitted.

25.     Denied.   By way of further answer, it is unknown how much mail Defendant processed on December 27, 2011; December 28, 2011; and December 29, 2011.   In his Deposition, when asked whether this statement was based upon personal knowledge, records, or something else, Mr. Rees responded, "it's based on things like I know the person under whose responsibility the mailroom is and just anecdotally speaking, I know that their volumes are up after holidays.   My father worked for the Postal Service his entire life and was always complaining during the holiday season because of the mail volume, and just it's sort of life experience is what I would attribute that to…."   Mr. Rees confirmed that this statement was not based upon any review of records.   See Exhibit 4, pg. 15, ln. 7-25; pg. 16, ln. 7-10.   Further, during the deposition of Melvin Jackson, an individual that worked in Defendant's disputes department in December 2011, which processes, in part, cease and desist letters, he could not remember how many cease and desist letters were received by the disputes department received on December 27, 2011; December 28, 2011; or December 29, 2011.   Exhibit 5, pg. 22, ln. 23-25; pg. 23, ln. 1-15.

26.     Admitted.   By way of further answer, Defendant has not produced any policy or procedure regarding the processing of mail or cease and desist letters.   Further,

Defendant does not attach any policy or procedure to its Motion for Summary Judgment regarding its mail processing procedures.

27.     Denied.  By way of further answer, at 10:37 a.m. EST, Defendant had knowledge that Plaintiff was represented by counsel, yet continued to contact him regarding the underlying debt.  Further, in support of this assertion, Defendant relies upon the affidavit of Timothy Rees, but has not produced to Plaintiff or attached to its motion any policy or procedure showing its "practice" for handling correspondence notifying Defendant of attorney representation or requests that Defendant cease and desist collection activity.  See Doc. No. 81-2; 81-5; 81-6.  Further, when asked if he has read his company's policies and procedures for ceasing communication with a consumer that is represented by counsel, Mr. Rees stated, "I have read the FDCPA which is part of our company's policies which addresses ceases and decisions and attorney representation." See Exhibit 4, pg. 20, ln. 24-25; pg. 21, ln. 1-5.  When asked if he has read anything else in writing, any other policy or procedure, other than the FDCPA, on ceasing communications with a consumer, Mr. Rees replied, "I can't recall what I would have read because I don't know why I would have – if I know that I'm bound by the FDCPA and I know what the FDCPA says about ceases and desists and attorney representation, I may have read something else in relation to that, but I don't know because that's not something that would need to register to memory."  See Exhibit 4, pg. 21, ln. 7-18. Clearly, Mr. Rees affidavit cannot be relied upon for such assertion, as he has no knowledge of Defendant's policies and procedures.

28.    Denied.  By way of further answer, the affidavit upon which Defendant relies for this assertion has not factual basis, as to date, Defendant has failed to produce any documentation showing its "practice" for handling correspondence notifying Defendant of attorney representation or requests that Defendant cease and desist collection activity, and no such documentation is attached to Defendant's Motion.  See Doc. No. 81-2; 81-5; 81-6.  Since Defendant has not produced any policies or procedures, it is unknown whether such policies and procedures exist.  Further, Mr. Rees cannot testify to any policies and procedures of Defendant; rather, he is only aware of the language of the FDCPA.  See Exhibit 4, pg. 20, ln. 24-25; pg. 21, ln. 1-18.

29.    Denied.  By way of further answer, the affidavit upon which Defendant relies for this assertion has not factual basis, as to date, Defendant has failed to produce any documentation showing its "practice" for handling correspondence notifying Defendant of attorney representation or requests that Defendant cease and desist collection activity, and no such documentation is attached to Defendant's Motion.  See Doc. No. 81-2; 81-5; 81-6.  Since Defendant has not produced any policies or procedures, it is unknown whether such policies and procedures exist.  Further, Mr. Rees cannot testify to any policies and procedures of Defendant; rather, he is only aware of the language of the FDCPA.  See Exhibit 4, pg. 20, ln. 24-25; pg. 21, ln. 1-18.

30.    Denied.  By way of further answer, the affidavit upon which Defendant relies for this assertion has not factual basis, as to date, Defendant has failed to produce any documentation showing its "practice" for handling correspondence notifying Defendant of attorney representation or requests that Defendant cease and desist

- 7 -

collection activity, and no such documentation is attached to Defendant's Motion.  See Doc. No. 81-2; 81-5; 81-6.  Since Defendant has not produced any policies or procedures, it is unknown whether such policies and procedures exist.  Further, Mr. Rees cannot testify to any policies and procedures of Defendant; rather, he is only aware of the language of the FDCPA.  See Exhibit 4, pg. 20, ln. 24-25; pg. 21, ln. 1-18.

31.   Denied.  By way of further answer, the affidavit upon which Defendant relies for this assertion has not factual basis, as to date, Defendant has failed to produce any documentation showing its "practice" for handling correspondence notifying Defendant of attorney representation or requests that Defendant cease and desist collection activity, and no such documentation is attached to Defendant's Motion.  See Doc. No. 81-2; 81-5; 81-6.  Since Defendant has not produced any policies or procedures, it is unknown whether such policies and procedures exist.  Further, Mr. Rees cannot testify to any policies and procedures of Defendant; rather, he is only aware of the language of the FDCPA.  See Exhibit 4, pg. 20, ln. 24-25; pg. 21, ln. 1-18.

32.   Denied.  By way of further answer, the affidavit upon which Defendant relies for this assertion has not factual basis, as to date, Defendant has failed to produce any documentation showing its "practice" for handling correspondence notifying Defendant of attorney representation or requests that Defendant cease and desist collection activity, and no such documentation is attached to Defendant's Motion.  See Doc. No. 81-2; 81-5; 81-6.  Since Defendant has not produced any policies or procedures, it is unknown whether such policies and procedures exist.  Further, Mr. Rees cannot

testify to any policies and procedures of Defendant; rather, he is only aware of the language of the FDCPA.  See Exhibit 4, pg. 20, ln. 24-25; pg. 21, ln. 1-18.

33.    Denied.  By way of further answer, Defendant's own records indicate that 51 phone calls connected to Plaintiff.  At times, Defendant called Plaintiff as often as four (4) times in a single day.  Further, records subpoenaed from Plaintiff's telephone service provider indicate that Defendant called Plaintiff 58 times during the relevant period.  See Doc. No. 81-2; Exhibit 2.

34.    Denied.  By way of further answer, Defendant's account notes are not reliable, as at least in one instance, Defendant's notes do not match records subpoenaed from Plaintiff's telephone service provider.  See Doc. No. 81-2; Exhibit 2.

35.    Admitted.

36.    Denied.  By way of further answer, the affidavit upon which Defendant relies for this assertion has not factual basis, as to date, Defendant has failed to produce any documentation showing its "practice" for handling correspondence notifying Defendant of attorney representation or requests that Defendant cease and desist collection activity, and no such documentation is attached to Defendant's Motion.  See Doc. No. 81-2; 81-5; 81-6.   Since Defendant has not produced any policies or procedures, it is unknown whether such policies and procedures exist.  Further, Mr. Rees cannot testify to any policies and procedures of Defendant; rather, he is only aware of the language of the FDCPA.  See Exhibit 4, pg. 20, ln. 24-25; pg. 21, ln. 1-18.

ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT

37.    Defendant began collection activity on an account allegedly owed by Plaintiff in May 2007.  See Exhibit 2, pg. 9.

38.    Defendant spoke with Plaintiff twenty-two (22) times over the five (5) year period it was attempting to collect the alleged debt.  See Exhibit 2.

39.    The dates and summaries of the parties conversations captured in Defendant's own internal records are as follows:

| NO. | DATE | RESULT |
|---|---|---|
| 1 | June 18, 2007 | Plaintiff said he cannot make payments and Defendant let him know that Defendant knew he was trying to buy a car, Plaintiff hung up. |
| 2 | September 10, 2007 | Plaintiff is disabled and told Defendant that he is unable to pay the debt. |
| 3 | November 9, 2007 | In response to Defendant asking Plaintiff whether he was going to pay the debt, Plaintiff stated that he could not pay, and could not do anything, and then hung up on Defendant. |
| 4 | January 3, 2008 | Plaintiff told Defendant that he was unable to pay the alleged debt. |
| 5 | September 30, 2008 | Defendant asked Plaintiff about the multiple accounts that Defendant had for Plaintiff, to which Plaintiff told Defendant that he could not pay, and then hung up on Defendant. |
| 6 | October 16. 2008 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |
| 7 | October 21, 2008 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |
| 8 | October 22, 2008 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |
| 9 | October 24, 2008 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |
| 10 | October 25, 2008 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |
| 11 | October 26, 2008 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |

| 12 | October 28, 2008 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |
| 13 | October 28, 2009 | After Defendant inquired about the alleged Defendant, Plaintiff told Defendant that he was unable to pay, and then hung up on Defendant. |
| 14 | December 11, 2009 | An individual at Plaintiff's home picked up the phone, and then immediately hung up on Defendant. |
| 15 | May 21, 2010 | After Defendant inquired about the alleged debt, Plaintiff told Defendant that he was unable to do anything, and then hung up on Defendant. |
| 16 | June 2, 2010 | After Defendant inquired about the alleged debt, Plaintiff told Defendant that was not doing anything on that, and then hung up on Defendant. |
| 17 | June 15, 2010 | Defendant told Plaintiff who it was, to which Plaintiff hung up. |
| 18 | June 16, 2010 | Defendant told Plaintiff who it was, to which Plaintiff responded "**[Defendant] might as well quit calling**" and then hung up. |
| 19 | June 30, 2010 | After Defendant inquired about the alleged debt, Plaintiff told Defendant that he cannot pay, and then hung up on Defendant. |
| 20 | July 15, 2010 | An individual at Plaintiff's home picked up the phone, and then immediately hung up on Defendant. |
| 21 | December 27, 2011 | After Defendant inquired about the alleged debt, Plaintiff told Defendant he was working with an attorney about Defendant's harassing calls, and then hung up on Defendant. |

See Exhibit 2.

40.    The parties spoke only a small fraction of the times that Defendant called Plaintiff, as most of Defendant's calls to Plaintiff were unanswered or resulted in a message being left on his home's answering machine.  See Exhibit 2.

41.    On December 23, 2011, Plaintiff contacted the law firm of Kimmel & Silverman, P.C. for help in stopping Defendant's harassing collection calls.  See Doc. No. 81-5.

- 11 -

42.     On that same day, Kimmel & Silverman, P.C. prepared and mailed, via certified mail, a letter demanding that Defendant cease direct contact with Plaintiff and notifying Defendant that Plaintiff was represented by counsel.  See Doc. No. 81-5.

43.     Defendant received and signed for the December 23, 2011, letter on December 27, 2011, at 10:37 a.m. EST or 9:37 a.m. CST.  See Doc. Nos. 81-6; 81-7.

44.     Nearly ten (10) hours later, at 7:24 p.m. CST, Defendant called Plaintiff in an attempt to collect the alleged debt, despite having received written notification that Plaintiff was represented by counsel and that all calls to Plaintiff were to be ceased.  See Exhibit 2.

45.     Two days after Defendant received and signed for the December 23, 2013, letter, it finally notated Plaintiff's account to reflect that the letter had been received.  Id.

46.     Neither Timothy Rees, nor Tara Privette, Defendant's corporate representatives, have been able to testify as to any procedures that Defendant had in place to process mail in December 2011.[1]

47.     Further, Defendant has not produced any policies or procedures for the processing mail.

48.     Defendant has given no explanation, or excuse, as to why it took two (2) days to note that it had received a letter demanding that contact with Plaintiff cease and that Plaintiff was represented by counsel on his account.

---

[1] Defendant first designated Timothy Rees as its corporate representative to be deposed pursuant to Rule 30(b)(6). After Mr. Rees was unprepared for his deposition, and after Plaintiff's Motion to Compel was granted, Plaintiff sought leave of court to re-depose Defendant's corporate representative.  Plaintiff's request was granted, and on the day of the deposition with no prior notice or explanation, Tara Privette, not Timothy Rees, appeared as Defendant's Rule 30(b)(6) representative.

49.     Defendant claims that its "practice" for processing letters of representation is in writing, but Defendant has never produced any policy or procedure about its mail processing.  <u>See</u> Exhibit 4, pg. 20.

<u>ARGUMENT</u>

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will only be granted: if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <i>See</i> Fed. R. Civ. P. 56(c).  "A fact is 'material' if proof of its existence or non-existence might affect the outcome of the suit under applicable law."  <u>See</u> <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986).  A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. <u>See Henderson v. Walled Lake Consol. Schools,</u> 499 F.3d 479, 487 (6th Cir. 2006). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>See Anderson</u>, 477 U.S. 242, at 248.

In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. <u>See</u> <u>Van Gorder v. Grand Trunk Western Railroad, Inc.</u>, 509 F.3d 265, 268 (6th Cir.2007). In order to defeat a summary judgment motion, the nonmoving party must provide more

than a scintilla of evidence; that is, the nonmoving party must present evidence sufficient to permit a reasonable jury to find in its favor.  See *Id.* at 268.

**A. Background on the Fair Debt Collection Practices Act**

This action is brought pursuant to the provisions of the federal Fair Debt Collection Practices Act ("FDCPA" or "the Act"), 15 U.S.C. §1692 *et seq*.  "The FDCPA is a landmark piece of consumer credit legislation designed to eliminate abusive, deceptive, and other unfair debt collection practices."  See Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 22 (1st Cir. 2002).  Congress included in the text of the FDCPA that, "There is abundant evidence of the use of abusive, deceptive and unfair debt collection practices by many debt collectors.  Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."  See 15 U.S.C. §1692(a).  "It is the purpose of this title to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  See 15 U.S.C. §1692(e).

Consumer protection statutes, such as the Truth in Lending Act, the Fair Credit Reporting Act, and the FDCPA, are "remedial in nature and therefore must be construed liberally in order to best serve Congress' intent."  See Ellis v. GMAC, 160 F.3d 703 (11th Cir. 1998).  Thus, given the clear Congressional intent stated above, the FDCPA has been found to be a ***strict liability*** statute.  See Russell v. Equifax ARS, 74 F.3d 30, 33 (2nd Cir. 1996); Reichert v. National Credit Systems, Inc., 531 F.3d 1002, 1005 (9th Cir. 2008);

and <u>Bartlett v. Heibl</u>, 128 F.3d 497, 499 (7th Cir. 1997).  ***Only a single violation of the Act need be proven in order to impose liability.***  <u>See</u> <u>Bartlett</u>, *supra.* at 499 (emphasis added); <u>see</u> <u>also</u> <u>Turner v. J.V.D.B. & Assoc., Inc.</u>, 330 F.3d  991, 995 (7th Cir. 2003). "A consumer need not show intentional conduct by a debt collector to be entitled to damages."  <u>See</u> <u>Id</u>.

### B. Defendant has only moved for Summary Judgment on a portion of Plaintiff's claims

As an initial matter, it is unclear as to which of Plaintiff's FDCPA claims Defendant is targeting with its Motion for Summary Judgment.  Although labeled "Defendant's Motion for Summary Judgment," Defendant does not address all of Plaintiff's claims under the FDCPA, thereby making its motion a Motion for *Partial* Summary Judgment.  A Response in opposition to a Motion for Summary Judgment need only address those issues raised in the Motion itself.  <u>See</u> <u>O'Loughlin v. The Pritchard Corp.</u>, 972 F. Supp. 1352, 1367 (D. Kan. 1997) (<u>citing</u> <u>Malhotra v. Cotter & Co.</u>, 885 F.2d 1305, 1310 (7th Cir. 1989); <u>see</u> <u>also</u> <u>Ferini v. Denver Publ'g Co.</u>, 153 F.3d 727 (10th Cir. 1998).  "When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not."  <u>Malhorta</u> 885 F.2d at 1310.

Defendant argues that call volume alone does not establish a violation of the FDCPA, focusing on Plaintiff's claim under 15 U.S.C. §1692d(5), and argues that a post-cease and desist letter contact was not a violation, or alternatively, was a bona fide error, apparently focusing on Plaintiff's claim under 15 U.S.C. §1692c(a)(2).  Defendant,

however, has failed to address, and has not moved for summary judgment, on Plaintiff's claims under §1692c(c), §1692d, §1692e, and §1692f.

Of significance, a claim under §1692c(c) is only superficially similar to a claim under §1692c(a)(2), as different standards, different statutory language, and different case law applies to the two distinct sections.  A claim under §1692c(c) only requires proof of receipt of written notification demanding the cessation of contact, not "knowledge" of that demand.  Compare 15 U.S.C. § 1692c(a)(2) (prohibiting contact with the consumer when the debt collector "knows the consumer is represented by an attorney…") with 15 U.S.C. § 1692c(c) (prohibiting contact with a consumer when the debt collector has been notified in writing that the consumer wishes contact to stop, and stating that "[i]f such notice from the consumer is made by mail, notification shall be complete upon receipt.").

Further, Defendant's arguments in regards to Plaintiff's 15 U.S.C. §1692d(5) claim are centered solely on the issue of intent, and unlike § 1692d(5), §1692d, does *not* require a showing of intent.  Instead, a plaintiff alleging a violation of §1692d, only needs to show that the conduct in which the debt collector engaged in had the natural consequences of harassment, regardless of whether the debt collector intended for its actions to have a harassing affect.  Compare 15 U.S.C. § 1692d (prohibit a debt collector from engaging in "any conduct the natural consequence of which is to harass, oppress, or abuse any person…") with 15 U.S.C. § 1692d(5) (prohibiting a debt collector from "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass any person at the called number.")

- 16 -

Finally, Defendant fails to address in any manner, or move for summary judgment, on Plaintiff's claims under 15 U.S.C. §§ 1692e, 1692f.  <u>See</u> Doc. No. 51 at ¶ 29f, g.

Because Defendant has not addressed, or moved for summary judgment, on Plaintiff's claims under §1692c(c), §1692d, §1692e, and §1692f, this Honorable Court should consider Defendant's Motion for Summary Judgment solely as a Motion for Partial Summary Judgment on Plaintiff's §§1692c(a)(2) and 1692d(5) claims.

**C. There is sufficient evidence on the record to establish that Defendant intended to annoy or harass Plaintiff**

Despite knowing that its calls were unwanted, that Plaintiff was unable to pay the debt, and that Plaintiff was unwilling to pay the debt, Defendant continued to call Plaintiff on a repetitive basis with the intent to harass and annoy.  Section 1692d(5) of the FDCPA prohibits a debt collector from "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass any person at the called number."  15 U.S.C. §1692d(5).

The quantity of phone calls is ***not*** the only factor considered by courts in determining whether a debt collector has violated §1692d(5).  Instead, pattern and contents of the calls is also reviewed.  <u>See</u> <u>e.g.</u>, <u>Akalwadi v. Risk Mgmt. Alternatives, Inc.</u>, 336 F.Supp. 2d 492, 505 (D. Md. 2004).  Further, a debt collector's intent to annoy or harass can be inferred in situations where the consumer tells the debt collector that he is unable to pay, unwilling to pay, or situations where the consumer verbally requests that the call stop.  <u>See</u> <u>e.g.</u>, <u>Gilroy v. Ameriquest Mortg. Co.</u>, 632 F.Supp. 2d 132, 136-37 (D. N.H. 2009) ("Intent may also be inferred by evidence that the debt collector continued to

call the debtor after the debtor had asked not to be called and had repeatedly refused to pay the alleged debt…") (citing Kerwin v. Remittance Assistance Corp., 559 F.Supp. 2d 1117, 1124 (D. Nev. 2008); Strom v. Nat'l Enter. Sys., Inc., 2011 WL 1233118 (W.D. N.Y. Mar. 30, 2011) (denying the defendant's Motion for Summary Judgment on Plaintiff's §1692d(5) claim because, in part, the defendant "continued to call [the plaintiff] even after [the plaintiff's] request that [the defendant] cease phoning her…"); Prewitt v. Wolpoff & Abramson, LLP, 2007 WL 841778 (W.D. N.Y. Mar. 19, 2007) (denying the defendant's Motion for Summary Judgment on the plaintiff's §1692d(5) claim in part based on the fact that the defendant continued to call after the plaintiff told the defendant that he was unable to pay the underlying debt).

Here, Defendant called Plaintiff over a four year period and on multiple telephone numbers.  During the parties' first conversation, Plaintiff told Defendant that he was unable to pay the debt.  In fact, Plaintiff told Defendant on at least nine (9) separate occasions that he was unable or unwilling to pay the alleged debt.  Plaintiff even told Defendant that his inability to pay stemmed from his disability—a fact that Defendant even noted in its own internal records.  Further evidencing the annoyance of Defendant's calls, Plaintiff hung-up on Defendant at least twenty-one (21) times, and on one instance, explicitly told Defendant that it "might as well quit calling."  Defendant did not quit.  Instead, it noted in its internal records that Plaintiff often hung up when Defendant called, and that when calling, its debt collectors should ask for Plaintiff's wife to avoid being hung up on.  See Exhibit 2, at p.1 "Ask for N2, N1 likes to HU."

Then, in August 2011, Defendant obtained a new number for Plaintiff through skip-tracing.  Rather than ceasing calls, Defendant resumed calling Plaintiff, despite having knowledge that its calls were unwanted.  In the months leading up to Plaintiff retaining counsel, Defendant called Plaintiff at least 33 times.  The number alone may not seem overwhelming; however, it is Defendant's intention as well as the pattern of these calls that makes the calls violative of §1692d(5).  On multiple occasions, Defendant called Plaintiff three times in a single day, and on September 23, 2011, Defendant called Plaintiff four (4) times in one day.  Each time Defendant called Plaintiff, it knew that he was unable to pay, unwilling to pay, and that its calls were unwanted.  Nevertheless, Defendant persisted in calling him, and called him at times, multiple times in a single day.  This fact alone evidences Defendant's intent to annoy and harass Plaintiff.

As there is sufficient evidence showing that Defendant called Plaintiff on a repetitive basis with the intent to annoy and harass, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion.

## D. Defendant communicated with Plaintiff after it had knowledge that Plaintiff was represented by an attorney

Section 1692c(a)(2) of the FDCPA prohibits a debt collector from communicating with a consumer "if the debt collector knows the consumer is represented by an attorney…."  15 U.S.C. §1692c(a)(2).  As a matter of law, a signed certified mail receipt for a letter notifying a debt collector of representation is proof that that debt collector knew the consumer was represented by an attorney.  See Isham v. Gurstel, Staloch & Chargo, P.A., 738 F. Supp. 2d 986, 993 (D. Ariz. 2010).

- 19 -

Here, it is undisputed that Defendant received written notification of Plaintiff's representation nearly ten (10) hours before it made its December 27, 2011, telephone call to Plaintiff.  Despite receiving this notification, and having knowledge that Plaintiff was represented by an attorney, Defendant communicated with Plaintiff in an attempt to collect the underlying debt.

By calling Plaintiff after having received written correspondence that he was represented by counsel and did not want to be contacted, Defendant violated §1692c(a)(2) of the FDCPA.  Therefore, Defendant's Motion for Summary Judgment should be denied.

### E. Defendant has failed to meet its burden in established that it maintained procedures reasonably adapted to avoid violating the FDCPA

Lastly, Defendant asserts a bona fide error affirmative defense, thereby acknowledging that its conduct violated the FDPCA.   However, Defendant has completely failed to meet its burden in establishing the affirmative defense of bona fide error.  Section 1692k(c) states that:

> A debt collector may not be held liable in any action brought under this title if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

The Tenth Circuit has broken down the analysis into a three parts: (1) the subjective analysis as to whether the violation was intentional; (2) the objective analysis as to whether the error was bona fide; and (3) the objective analysis as to whether the debt collector maintained procedures reasonably adopted to avoid error.  <u>Johnson v. Riddle</u>,

443 F.3d 723, 728 (10th Cir. 2006).  The third prong is further broken down into two parts.  Id at 729.  First, were the procedures "maintained," or in other words, were the procedures actually employed or implemented.  Id.  Second, were the procedures reasonably adapted to avoid the *specific* error.  Id.  Analysis of whether a debt collector's procedures are maintained and whether they are reasonably adapted is a fact-intensive analysis that differs drastically from case to case.  See Wilhelm v. Credico, Inc., 519 F.3d 416, 421 (8th Cir. 2008).  Given the factual component and the credibility issues that are inherent in a bona fide error analysis, the question of whether a debt collector can escape liability is often reserved for the jury.  See Martinez v. Johnson, 2:11CV157-DN, 2013 WL 1031363 (D. Utah Mar. 14, 2013) ("The issue of intent under the bona fide error defense is principally a credibility question as to the defendants' subjective intent to violate the FDCPA. As such, the defendants' protection under the bona fide error defense is a jury question, and on the record before this court, cannot be determined in favor of the defendants as a matter of law"); see also e.g., Johnson, 443 F.3d at 732; McCollough v. Johnson, Rodenburg & Lauinger, LLC, 637 F.3d 939, 948 (9th Cir. 2011).

Plaintiff does not need to address the first two prongs of the analysis, as Defendant is unable to meet its requirements under the third prong of the bona fide error analysis. The violation in this case is the communication with Plaintiff after Defendant received the letter of representation, but before it noted the letter on the account two days later. Therefore, in order to escape liability under this affirmative defense, Defendant has the burden of establishing that it *maintained* procedures *reasonably adapted* to avoid calling

consumers after it received letters of representation, but before the representation was noted on the consumers account.

To begin with, Plaintiff is unable to address the reasonableness of Defendant's procedures, because Defendant has not even produced or explained its alleged procedures.    Defendant has produced no admissible evidence regarding its mail processing procedures nor has it produced any evidence regarding the quantity of mail that it received on December 27, 2011, or any other day[2].   Defendant's corporate representatives could not state the number of employees who worked in Defendant's mailroom, did not know what hours the mailroom was open, could not name the individuals in charge of the mailroom, and did not even know whether the mail was opened in the mailroom or sent to a different department first.[3]   Further, the procedures referenced in Defendant's Affidavit in Support are allegedly in writing, but have never been produced during the course of discovery, and were never disclosed in Defendant's Initial Disclosures pursuant to F.R.C.P. 26(a).

---

[2]   It is unknown how much mail Defendant processed on December 27, 2011; December 28, 2011; and December 29, 2011.  In his Deposition, when asked whether he had personal knowledge of the mail PRA receives, Mr. Rees responded, "I know the person under whose responsibility the mailroom is and just anecdotally speaking, I know that their volumes are up after holidays.  My father worked for the Postal Service his entire life and was always complaining during the holiday season because of the mail volume, and just it's sort of life experience is what I would attribute that to…."   Mr. Rees confirmed that he had not reviewed any records of mail received by Defendant in December 2011.  See Exhibit 4, pg. 15, ln. 7-25; pg. 16, ln. 7-10.  Further, during the deposition of Melvin Jackson, an individual that worked in Defendant's disputes department in December 2011, which processes, in part, cease and desist letters, he could not remember how many cease and desist letters were received by the disputes department received on December 27, 2011; December 28, 2011; or December 29, 2011.  Exhibit 5, pg. 22, ln. 23-25; pg. 23, ln. 1-15.

[3]   During his deposition, Mr. Rees testified that he did not know in December 2011, how many employees worked in the mailroom.  See Exhibit 4, pg. 29, ln. 2-4.  Mr. Rees did not have any personal knowledge regarding how Plaintiff's cease and desist letter was processed.  See Exhibit 4, pg. 29, ln. 5-8.  He did not know how many pieces of first class or certified mail Defendant received on December 27, 2011, or December 28, 2011, or how many cease and desist letters or letters of representation Defendant received on December 27, 2011, or December 28, 2011.  See Exhibit 4, pg. 29, ln. 9-25; pg. 30, ln. 1-21.

Further, Defendant has not provided any admissible evidence regarding the volume of mail received by Defendant or December 27, 2011, December 28, 2011, and December 29, 2011. Rather, Defendant wants this Court to believe that it receives 4,500 pieces of mail and 150 pieces of certified mail, daily, and that during the holiday season mail volume likely increased[4]. However, this statement has no relevance to this matter, as it is not based upon any review of the records from 2011. During the deposition of Timothy Rees, Mr. Rees revealed that these figures are based upon "correspondence [he] viewed from the mailroom supervisor," written "in 2013," about "current mail volume." See Exhibit 4, pg. 14, ln. 8-25; pg. 15, ln. 1-6. Mr. Rees acknowledged that he did not review any records; rather, Mr. Rees stated, "it's based on things like I know the person under whose responsibility the mailroom is and just anecdotally speaking, I know that their volumes are up after holidays. My father worked for the Postal Service his entire life and was always complaining during the holiday season because of the mail volume, and just it's sort of life experience is what I would attribute that to…." See Exhibit 4, pg. 15, ln. 7-25; pg. 16, ln. 7-10. Mr. Rees further testified that his job duties did not require him to know the volume of mail received by Defendant. See Exhibit 4, pg. 32. Also, during the deposition of Melvin Jackson, an individual that worked in Defendant's disputes department in December 2011, which processes cease and desist letters, he could not remember how many cease and desist letters were received by the disputes

---

[4] It goes without saying that Defendant, a debt collection company, not likely inundated with holiday cards and gifts in December 2011 — the most obvious reason that there is a higher volume of mail during the holiday season.

department received on December 27, 2011; December 28, 2011; or December 29, 2011. Exhibit 5, pg. 22, ln. 23-25; pg. 23, ln. 1-15.

As such, the only facts on the record establish that Defendant received one letter of representation on December 27, 2011, which was Plaintiff's letter of representation. While Defendant can guess, and even assume, that it received more than just that one letter that day, the record does no support such guesses or assumptions[5]. If Defendant only received one letter of representation on December 27, 2011, or even one letter of representation the entire month of December 2011, there would be no conceivable argument that it maintained procedures reasonably adapted to avoid calling consumers after it received a letter of representation.

But even if Defendant's guesses regarding its mail volume could be proven to be accurate, a "large publicly traded corporation's" inability to process a mere 150 pieces of certified mail in ten hours is anything but reasonable.[6] Defendant did not even process the letter of representation until two days after it was received. Defendant has failed to establish that it has any procedures in place to assure that letters of representation are processed in a *timely* manner. Even if Defendant has procedures in place to assure that a consumer is not called after it processes a letter of representation, what is preventing

---

[5]     Melvin Jackson, an individual working in Defendant's disputes department in December 2011, testified that it varies how many cease and desist letters he receives in a day. He may get one letter some days, and on other days, more than one letter. At times, it's possible that he gets no letters. See Exhibit 5, pg. 6, ln. 8-17. Further, Mr. Jackson believes that there are between 20-50 people working in Defendant's disputes department. See Exhibit 5, pg. 6, ln. 18-25; pg. 7, ln. 1-11.
[6]     Defendant's basis for including the numbers in paragraph 8 of its affidavit in support of its motion is a mysterious correspondence, not even addressed to Defendant's affiant, and not even related to the volume of mail in December 2011, the relevant period. See Exhibit 4 at p. 15

Defendant from simply not "processing" the letter of representation, for days or weeks? According to the evidence on the record — nothing.

Because Defendant has failed to meet its burden in establishing that it maintained procedures reasonably adapted to avoid calling consumers after receiving letters of representation, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion.

<u>CONCLUSION</u>

For the forgoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

Dated: <u>November 1, 2013</u>

By: <u>/s/ Tara L. Patterson</u>
Tara L. Patterson, Esquire
KIMMEL & SILVERMAN, P.C.
30 East Butler Pike
Ambler, PA 19002
Email: tpatterson@creditlaw.com
*Attorney for Plaintiff*

By: <u>/s/ Joseph L. Gentilcore</u>
Joseph L. Gentilcore, Esquire
KIMMEL & SILVERMAN, P.C.
30 East Butler Pike
Ambler, PA 19002
Email: jgentilcore@creditlaw.com
*Attorney for Plaintiff*
*Admitted Pro Hac Vice*